**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**JACKSON DIVISION**

**EUGENE NICHOLS**                                                                    **PLAINTIFF**

**V.**                                        **CIVIL ACTION NO.  3:10CV420 CWR-LRA**

**MICHAEL J.  ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY**                                  **DEFENDANT**

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Eugene Nichols has filed a motion for summary judgment appealing the

final decision denying his applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").  The Commissioner opposes the motion and

requests an order pursuant to 42 U.S.C. § 405(g), affirming the final decision of the

Administrative Law Judge.  Having carefully considered the hearing transcript, the

medical records in evidence, and all the applicable law, the undersigned recommends that

the decision be affirmed.

**Procedural Background**

On May 4, 2006, Plaintiff filed applications for DIB and SSI, alleging he became

disabled on August 14, 2004.  The applications were denied initially and on

reconsideration.  He appealed the denial and on January 16, 2009, Administrative Law

Judge Todd Spangler ("ALJ") rendered an unfavorable decision finding that Plaintiff had

not established a disability within the meaning of the Social Security Act.  The Appeals

Council denied Plaintiff's request for review on June 11, 2010.  He now appeals that

decision.

**Facts and Medical Evidence**

Plaintiff is 57 years old and has a high school education.  He has not worked since injuring his back in a work-related accident in 2000, and he alleges disability due to degenerative disc disease in the lumbar and cervical spine, hypertension, dizziness and diabetes.[1]  He has past relevant work experience as a tractor operator and furniture framer.

Records reflect that Plaintiff was treated conservatively with medication for complaints of chronic low back pain though June 2001.  His condition became aggravated following a car accident in January 2002.  He continued to be treated conservatively with medication, with improvement, by Dr. Louis Saddler at Canton Physician Group.  An MRI taken of his lumbar spine in July 2002 showed mild facet degeneration at L5-S1, but was otherwise normal.[2]

Two years later, in November 2004, Plaintiff was seen by Dr. Ruby Moy for a consultative examination.  Plaintiff told Dr. Moy that he had been hypertensive for six months, but had not been to a doctor or taken medication regularly due to financial reasons.  He also advised that he had been diagnosed with diabetes at a health fair.  He reported dyspnea and shortness of breath if he walks more than one block, feelings of dizziness when he bends over, and low back pain radiating to his left hip.  Dr. Moy's

---

[1]ECF No. 7-6, p. 21.

[2]ECF No. 7-7, pp. 10-27; ECF No. 7-7, pp. 51-70.

physical examination indicated that Plaintiff's blood pressure was 144/72.  He was also obese but ambulated without difficulty, with no dyspnea at rest.  Plaintiff was noted to have "mild tenderness over the cervical spine, without restriction in range of motion," and "moderate tenderness over the mid and lower lumbar spine."  His straight leg raises were negative; he could heel-toe walk slowly and could "squat and recover" with assistance.  Dr. Moy's impressions were low back pain, probable diabetes, uncontrolled hypertension, and shortness of breath likely due to heart disease.  He also advised Plaintiff to go to a free clinic if he could not afford his local physician, and he ordered X-rays which reflected a slight elongation of the transverse processes of L1, with pseudoribs, but no fractures or "significant radiographic abnormality."[3]

Another year and a half went by before Plaintiff was examined by another physician.  In May 2006, Orthopedist Gordon Nutik, M.D., conducted an independent medical examination at counsel's request.  At that time, Plaintiff described his back pain as sharp and constant and "hot all the time."  He denied neck pain and any radiation of pain to his lower extremities, but told Dr. Nutik that he had been feeling "a little tingling in his right hand for the past two weeks."  He also advised that he could not lift anything, and could not walk more than 300 to 400 yards without feeling shortness of breath or

---

[3]ECF No. 7-7, pp. 53-55.  Social Security regulations provide that a claimant may have justifiable cause for not following prescribed treatment if he is unable to afford it, and free community resources are unavailable.  SSR 82-59, 1982 WL 31384 at * 4.  The record does not indicate whether Plaintiff sought such treatment in this case.

dizzy.  In his narrative report, Dr. Nutik noted that Plaintiff was able to walk "normally," and that examination of his neck revealed a decrease in the cervical lordosis, pain to palpation at C7, but no pain about the trapezius or sternonmastoid muscles.  Cervical compression was negative, but neck motion was noted to be "50 degrees of forward flexion, 10 degrees of extension and right lateral and left lateral flexion were 15 degrees. Rotation to the right and left was 45 degrees."  Plaintiff's lower back revealed a decrease in the lumbar lordosis, and pain to palpation from L1 to L5, but no pain about the paravertebral or gluteal muscles.  There was no evidence of back spasms and "forward bending was to where the fingertips reached to a level 6" below the knee with the lumbar lordosis reversing partially."  Lateral bending was 33% of normal limits and rotatory motion was 50% of normal limits.  Straight leg raising was 50 degrees bilaterally and his hamstrings were noted to be tight.  A neurological examination of his lower extremities revealed normal sensation to light touch, muscle power equal on muscle testing, and no atrophy of the lower extremities on circumferential measurement.[4]

X-rays ordered by Dr. Nutik of both the lumbar and cervical spine revealed no fractures.  There was narrowing at C3-4 and C4-5 discs by 50%; at C5-6 by 66% with apparent disc fusion; and at C6-7 by approximately 25%.  Osteophytes were also seen from C3 through C6, and cervical lordosis was decreased.  Disc heights in the lumbar spine were maintained and osteophytes were present at T11 and T12.  Based on his

---

[4]ECF No. 7-7, pp. 77-84.

orthopaedic findings and x-rays, Dr. Nutik determined that Plaintiff had "severe multi-

level degenerative disease about the cervical spine" which was "likely responsible for the

limited neck motion and recent onset of tingling in the right hand and the chronic loss of

left biceps tendon reflex." He concluded that Plaintiff did not meet the Listing of any

impairments and would be restricted to a "light level of physical activity." As for his

shortness of breath when walking, Dr. Nutik advised Plaintiff to see a medical doctor.

He also completed a medical source statement in which he indicates that Plaintiff should

not lift or carry more than 20 pounds occasionally and 10 pounds frequently; he should

not stand or walk more than 2 hours, but could sit 6 hours, and could push or pull without

limitations. He would have a limited ability to reach, and should avoid working at

heights due to limited neck movement. Plaintiff should also never climb, crouch, or

crawl, and could only occasionally balance, stoop, and kneel. These postural limitations

are the only limitations Dr. Nutik directly attributed to Plaintiff's degenerative disc

disease.[5]

In June 2006, Plaintiff returned to Dr. Saddler for continued complaints of low

back pain, shortness of breath, and tingling in his hands. He was assessed with low back

pain and continued on his current medication. Approximately three months later,

Plaintiff underwent a consultative examination by Dr. Andrew Yates. Plaintiff told Dr.

Yates that he could not stand more than 15-20 minutes because of back pain; he also

_____

[5]ECF No. 7-7, pp. 77-84.

reported that it was difficult for him to sit, but denied the pain radiated to his lower extremities.  Upon examination, Dr. Yates noted that he had a full range of motion in his neck, and in his upper and lower extremities.  His back showed anterior flexion to 90 degrees and 30 degrees on the right and left lateral flexion.  His straight leg raises were normal, and Plaintiff could squat to "seventy-five percent of normal."  His gait was normal, he could heel and toe walk, and had no difficulty getting on or off of the examination table.  Dr. Yates's impressions were history of lumbar disc disease treated conservatively, untreated hypertension, and possible diabetes "requiring no medication at the present time."  X-rays of the lumbar spine taken around that same time at Central Mississippi Medical Center were also negative.  No fractures or dislocation were seen and alignment and disc spaces were normal.[6]

Plaintiff was last treated for chronic back pain in March 2007.  Emergency room records from Madison County Medical Center indicate that Plaintiff was ambulatory with a steady gait and "no obvious defects."  Plaintiff was treated with Toradol and reported feeling better.  He was discharged home and instructed to apply heat to his back.[7]

### Administrative Hearing Testimony

Plaintiff testified that he was in so much pain at the administrative hearing that his back felt as if it was on fire.  He testified that his pain had gotten progressively worse

---

[6]ECF No. 7-7, pp. 52, 73, 75-76.

[7]ECF No. 7-8, pp. 7-12.

since 2004, and when he wakes in the morning, his "head starts spinning" because of his high blood pressure. He reported that he received an injection for his back pain in 2000, but was not on any types of medication because he could not afford them. When asked whether he felt like he needed to be on medication, Plaintiff responded "[w]ell it's hurting. I can't measure what – you know – what is a nine or right." When asked by the ALJ how his back was affected if he stood for prolonged periods of time, Plaintiff responded that he would feel dizzy. The following exchange then occurred:

> Q:   What I'm trying to get from you, is that you're alleging you can't work because of your back.
> A.   Right.
> Q.   You're not on any medication for your back, so when I'm asking what standing does to you, you need to tell me why it is you can't do activities at work, which is standing, lifting, bending, because of your back, because that's why you say you're disabled.
> A:   Mm-hm.
> Q.   So can you explain to me your condition, and help me understand why you can't work.
> A:   Well one part is, that when I you know, try to pick up something and it just — hurt me back there, I just can't do it.
> . . .
> Q:   So you can't lift because it causes pain.
> A:   Correct.
> Q:   When's the last time you had to go to the doctor . . . .
> Atty:   Dr. Nudic.
> ... .
> A:   Mm-hm.
> Q:   But that was for an examination. When did you last have treatment?
> A:   Ooh been awhile, been a good while.[8]

Plaintiff ultimately testified that he felt he could not stand or sit for more than two hours before his back begins to hurt, and he needed to lie down for three hours to relieve the pain. When asked if he had difficulty climbing stairs, he testified that he had not tried it,

---

[8]ECF No. 7-2, p. 33.

and when asked why, he responded "I said, I just don't know."[9]

Plaintiff also testified that he does household chores, a little cooking, and is able to drive and care for his personal hygiene without assistance.  He attends church and is able to walk without a cane or walker.  He does not have any children under the age of 18 and lives with his uncle.

### Findings of the Administrative Law Judge

After reviewing the evidence, the ALJ concluded that Plaintiff was not disabled under the Social Security Act.  At step one of the five-step sequential evaluation,[10] the ALJ found Plaintiff had not engaged in substantial gainful activity since his alleged onset date, August 14, 2004.  At steps two and three, the ALJ found that although Plaintiff's hypertension and degenerative disc disease were severe, neither impairment alone or in combination, met or medically equaled any listing.  At step four, the ALJ found that Plaintiff could not return to his past relevant work as a tractor operator, but he has the residual functional capacity to perform light work so long as he does not lift/carry more than 20 pounds occasionally and 10 pounds frequently, and only occasionally climbs ramps, stairs, ladders, scaffolds, and ropes, and occasionally stoops, crouches, crawls,

_____

[9]ECF No. 7-2, pp. 22-34.

[10]Under C.F.R. § 404.1520, the steps of the sequential evaluation are: (1) Is plaintiff engaged in substantial gainful activity? (2) Does plaintiff have a severe impairment? (3) Does plaintiff's impairment(s) (or combination thereof) meet or equal an impairment listed in 20 C.F.R. Part 404, Sub-part P, Appendix 1? (4) Can plaintiff return to prior relevant work? (5) Is there any work in the national economy that plaintiff can perform?  *See also McQueen v. Apfel*, 168 F.3d 152,154 (5th Cir. 1999).

kneels, or balances.  The ALJ concluded at step five, that given Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff could perform work as a counter-clerk and ticket cashier.

### Standard of Review

Judicial review in social security appeals is limited to two basic inquiries: "(1) whether there is substantial evidence in the record to support the [ALJ's] decision; and (2) whether the decision comports with relevant legal standards." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991)). Evidence is substantial if it is "relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  This Court may not re-weigh the evidence, try the case *de novo*, or substitute its judgment for that of the ALJ, even if it finds evidence that preponderates against the ALJ's decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).

### Discussion

Plaintiff argues the ALJ committed errors at steps three, four and five of the sequential evaluation process.  He alleges that the ALJ failed to apply the correct legal standards in assessing his credibility and his residual functional capacity, and failed to pose a hypothetical to the vocational expert that accurately described his physical

limitations.  The Court finds the ALJ applied the correct legal standards and that

substantial evidence supports the ALJ's findings at every step of the sequential

evaluation.

### 1.      Substantial evidence supports the ALJ's credibility determination.

Plaintiff alleges that the ALJ's adverse credibility determination is not supported

by substantial evidence because he failed to conduct a thorough evaluation in compliance

with Social Security Ruling 96-7p.  SSR 96-7p requires the ALJ to engage in a two-step

process.  In the first step, the ALJ must consider whether there is an "underlying

medically determinable physical or mental impairment(s) that could reasonably be

expected to produce the individual's pain or other symptoms."  SSR 96-7p, 1996 WL

374186 * 2.  In the second step, the ALJ "must evaluate the intensity, persistence, and

limiting effects of the individual's symptoms to determine the extent to which the

symptoms limit the individual's ability to do basic work activities."  *Id.*  He should

consider Plaintiff's daily activities, symptoms, factors that precipitate and aggravate those

symptoms, medication and side effects, types of treatment, and functional limitations.  *Id*

* 3.

In compliance with SSR 96-7p, the ALJ indicated that after careful consideration,

he found Plaintiff's medically determinable impairments could reasonably be expected to

produce some of his alleged symptoms, but his testimony regarding the intensity,

persistence, and limiting effects were not fully credible.  Whenever statements about the

intensity, persistence or limiting effects of symptoms are not substantiated by objective

medical evidence, the ALJ has the discretion to make a finding on the credibility of the

statements and the determination is entitled to considerable deference. *Foster v. Astrue*,

277 F. App'x. 462 (5th Cir. 2008); *see also Gonzales v. Astrue*, 231 F. App'x 322 (5th Cir.

2007) (adverse credibility determination made by an ALJ was supported by

inconsistencies between claimant's testimony and documentary evidence).

      Plaintiff testified that his back pain was so severe at the administrative hearing that

it felt as if it was on fire. But the ALJ found "no evidence of extreme pain at the hearing"

and noted that Plaintiff "did not have to change positions frequently and was able to

remain seated throughout the hearing." These are "precisely the kinds of determinations

that the ALJ is best positioned to make" as he or she is able to observe the claimant first-

hand. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). *See also Villa v. Sullivan*, 895

F.2d 1019 (5th Cir.1990) (ALJ properly considered Plaintiff's demeanor during

administrative hearing as one of many factors in assessing credibility).

      Records also reflect that despite Plaintiff's descriptions of persistent and

unremitting pain, he had sought minimal treatment for his back pain and hypertension,

since his alleged onset date. As noted by the ALJ, Plaintiff last sought treatment for

chronic back pain in March 2007, a year and half before his hearing date, and, at that

time, he was prescribed medication and "told to use a heating pad."[11]  The treatment note

also reflects that Plaintiff felt better at discharge.  A medical condition that can

reasonably be remedied by either surgery, treatment, or medication is not disabling, and

the failure to seek treatment is an indication of non-disability.  *Villa,* 895 F.2d at 1024.

If a claimant, however, has a disabling condition for which effective treatment exists but

he cannot afford treatment, he cannot be denied disability solely on the basis that his

disability is treatable.  *Cornett v. Astrue,* 261 F.App'x 644, 650 n.8 (5th Cir. 2008) (citing

*Lovelace v. Bowen*, 813 F.2d 55-59-60 (5th Cir. 1987)).  But that was not the case here.

Benefits were denied not because of Plaintiff's inability to afford the medication, but

rather because he failed to prove that his impairments (untreated) were so severe that they

prevented him from performing light work.  *Peebles v. Chater*, 77 F.3d 477 (5th Cir.

1995).

In assessing Plaintiff's credibility, the ALJ noted that while Plaintiff stated he

could not afford treatment, he had not sought emergency room treatment nor purchased

over-the-counter medications.  He had also reported that he had difficulty standing and

walking, but his examining and treating physicians repeatedly observed that he

ambulated without difficulty.  He was also able to attend church, perform household

chores, drive, and walk without assistance.  Also, the objective medical findings did not

support his subjective statements concerning the intensity, persistence, and limiting

---

[11]ECF No. 7-2, p. 18.

effects of his pain.  An MRI of the lumbar spine taken in 2002 showed mild facet

degeneration, but was otherwise normal with no evidence of fractures.  X-rays taken two

years later similarly revealed no significant radiographic abnormality.  X-rays taken by

Dr. Nutik in 2006 continued to confirm no fractures in the cervical or lumbar spine,

though there was cervical disc narrowing indicative of severe multi-level degenerative

disc disease.  Dr. Nutik opined that the narrowing may be responsible for Plaintiff's

limited neck motion and the recent onset of tingling in the right hand, as well as the

chronic loss of the left biceps tendon reflex.  Yet, Dr. Nutik ultimately concluded, based

on orthopaedic findings, that Plaintiff did not meet a listing and could perform light

work, a finding adopted by the ALJ.  Subsequent examinations also yielded normal

results.  Dr. Yates noted that his degenerative disc disease had been treated

conservatively.  He had a decreased range of motion in his back, but a full range of

motion in his neck and extremities, and was able to get on and off the examination table

without difficulty.  His hypertension was untreated and his "possible diabetes" did not

require medication.

The Court concludes that the ALJ's credibility determination fully complies with

the applicable legal standards and is supported by substantial evidence.  In compliance

with SSR 96-7p, he gave specific reasons, supported by the record, for his adverse

credibility findings, and those findings should not be disturbed here.

**2.     Substantial evidence supports the ALJ's residual functional capacity assessment**.

Plaintiff alleges that the ALJ mis-characterized medical evidence in an attempt to support his residual functional capacity assessment, and that he erroneously adopted only some of Dr. Nutik's opinions.  As explained above, the ALJ concurred with Dr. Nutik's findings that Plaintiff has the residual functional capacity to perform light work except he can lift/carry no more than 20 pounds occasionally and 10 pounds frequently.  He did not adopt Dr. Nutik's findings that Plaintiff has a limited ability to reach, stand, and walk; should never climb, crouch, or crawl; and, should avoid exposure to heights, as he found these limitations were not supported by objective medical evidence.

The sole responsibility for determining a claimant's residual functional capacity rests with the ALJ.  20 C.F.R. § 404.1546(c) (2009).  The ALJ is free to reject the opinion of any physician, in whole or in part, when the evidence supports a contrary conclusion, when the opinions are conclusory, or when they are unsupported by medically acceptable clinical, laboratory, or diagnostic techniques.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172 (5th Cir. 1995).

Plaintiff argues that the ALJ's finding that he can occasionally crouch and crawl directly contradicts Dr. Nutik's opinion and substantial medical evidence.  But other than Dr. Nutik's assessment, Plaintiff does not direct the court to evidence supporting crouching or crawling limitations.  There is also little objective evidence supporting

Plaintiff's claims that he has any standing and walking limitations. In fact, it is not entirely clear that Plaintiff's alleged standing and walking limitations are attributable to his chronic back pain. Plaintiff told Dr. Nutik that he gets dizzy and "cannot walk more than about 300 to 400 yards" without feeling dizzy or shortness of breath, to which Dr. Nutik suggested that he see a medical doctor "to assess those complaints." Yet, Dr. Nutik found that Plaintiff was limited to standing and walking less than two hours a day. He did not explain in either his residual functional capacity assessment or narrative opinion what evidence he relied on, or which of his examination findings support this assessment. Rather, he left this portion of his assessment blank and only expressly attributed Plaintiff's postural limitations to his degenerative disc disease.

It was reasonable for the ALJ to conclude that Dr. Nutik's medical source statement was based, in part, on the claimant's subjective complaints rather than objective findings or evidence. In adopting only those opinions of Dr. Nutik that were supported by objective medical evidence, the ALJ did not, as Plaintiff alleges, mis-characterize the medical evidence. Other examiners of record, including Dr. Nutik, found that Plaintiff walked "normally," ambulated without difficulty, had a steady gait, could heel and toe walk, and had no difficulty getting on or off examination tables. The Court notes that Dr. Nutik explained that because of the limited neck movement Plaintiff exhibited in his examination, that he should avoid heights and would be limited in his ability to reach. But three months later, Dr. Yates noted that Plaintiff had a full range of motion in his

neck.  Conflicts in evidence are to be resolved by the ALJ, not a reviewing court.

*Hernandez v. Astrue*, 269 F. App'x 511, 515 (5th Cir. 2008).  This Court may not re-weigh

the evidence, try the case *de novo*, or substitute its judgment for that of the ALJ, even if it

finds evidence that preponderates against the ALJ's decision.  *Bowling*, 36 F.3d at 434.

Further, even if the Court were to find the ALJ erred in failing to adopt Dr. Nutik's

opinions in their entirety, the error was harmless for the reasons set forth below.

### 3.      The ALJ did not err at Step Five.

In his final assignment of error, Plaintiff argues the ALJ erred in relying on the

vocational expert's testimony that given his age, education, work experience, and

residual functional capacity, he could perform light work as a ticket cashier and counter-

clerk.  Plaintiff directs the Court to the ALJ's third hypothetical, which asked the

vocational expert to assume he has the residual functional capacity to perform light work

secondary to the limitations assessed by Dr. Nutik.  Though Plaintiff represents to the

Court that the vocational expert testified there would be "no jobs available," the hearing

transcript reflects that he testified that Plaintiff could perform sedentary work as a

surveillance monitor.[12]  The ALJ also asked the vocational expert to assume that Plaintiff

had the residual functional capacity to perform light work, except that he could not lift or

carry more than 20 pounds occasionally and 10 pounds frequently, and could only

occasionally climb, stoop, crouch, crawl, kneel and balance.  In response to this

---

[12]ECF No. 12, p. 13; ECF No. 7-2, p. 40.

hypothetical, the vocational expert testified that Plaintiff could perform work as a counter-clerk and ticket cashier.

Plaintiff asserts that he can perform neither job because both occupations, as defined in the Dictionary of Occupational Titles ("D.O.T."), and its companion publication, the *Selected Characteristics of Occupations*, require physical demands that exceed the functional limitations recognized by Dr. Nutik.  He points out that a ticket cashier requires frequent reaching, handling, and fingering, and a counter-clerk requires frequent reaching and occasional stooping and crawling.  *See* U.S. Dep't of Labor, *Selected Characteristics of Occupations* 333 (1993).  Yet, Dr. Nutik found he had reaching limitations and should never climb, crouch or crawl.  As with the standing and walking limitations, Dr. Nutik did not explain which of his objective findings support the reaching limitation.  And, as noted earlier, Plaintiff had a full range of motion in his neck in Dr. Yates's subsequent examination.  Moreover, though Dr. Nutik opined that Plaintiff should never crouch or crawl, only the counter-clerk position requires occasional crawling, and neither position requires climbing or crouching.

More importantly, in this circuit, a hypothetical need only "incorporate reasonably all disabilities of the claimant recognized by the ALJ."  *Bowling*, 36 F.3d at 436; *Vaught v. Astrue*, 271 F.App'x 452 (5th Cir. 2008).  There is no requirement to present limitations that are not borne out by the record, nor is an ALJ bound by a vocational expert's testimony based on evidentiary assumptions ultimately rejected by the ALJ or

unsupported by the medical evidence. *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir.

1985).  Further, unlike the D.O.T., which gives only general descriptions of job duties, a

"vocational expert is able to compare all the unique requirements of a specified job with

the particular ailments a claimant suffers in order to reach a reasoned conclusion whether

the claimant can perform the specific job." *Fields v. Bowen,* 805 F.2d 1168, 1170-71 (5th

Cir. 1986).  The Fifth Circuit has explained that:

> To the extent that there is any implied or indirect conflict between the
> vocational expert's testimony and the DOT . . . , we agree with the majority
> of the circuits that the ALJ may rely upon the vocational expert's testimony
> provided that the record reflects an adequate basis for doing so. . . [A]ll
> kinds of implicit conflicts are possible and the categorical requirements
> listed in the DOT do not and cannot satisfactorily answer every such
> situation. . . . Adopting a middle ground approach, in which neither the
> DOT nor the vocational expert testimony is per se controlling, permits a
> more straightforward approach to the pertinent issue, which is whether there
> is substantial evidence supporting the Commissioner's determination that
> this particular person can do this particular job or group of jobs.

*Carey v. Apfel*, 230 F.3d 131,146-147 (5th Cir. 2000).  Thus, the critical issue is not

whether the vocational expert's testimony and the D.O.T. conflict, but whether substantial

evidence supports the ALJ's finding that he can perform light work.

Based upon consideration of the evidentiary record as a whole, the ALJ determined

that Plaintiff failed to establish that his impairments were of sufficient severity to be

disabling.  The undersigned's review of the record compels a finding that the ALJ applied

the correct legal standard and that substantial evidence supports the ALJ's decision.

## Conclusion

For all the above reasons, it is the opinion of the undersigned United States

Magistrate Judge that Plaintiff's motion be denied; that Defendant's Motion for Order

Affirming the Commissioner be granted; that Plaintiff's appeal be dismissed with

prejudice; and, that Final Judgment in favor of the Commissioner be entered.

The parties are hereby notified that failure to file written objections to the proposed

findings, conclusions, and recommendation contained within this report and

recommendation within 14 days after being served with a copy shall bar that party, except

upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual

findings and legal conclusions accepted by the district court.  28 U.S.C. § 636, Fed. R.

Civ. P. 72(b) (as amended, effective December 1, 2009).

This the 17th day of February 2012.

/s/ Linda R. Anderson
UNITED STATES MAGISTRATE JUDGE